**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| WILFRED GUY, ) | |
| ) | CIVIL ACTION |
| Plaintiff, ) | |
| v. ) | No.  18-223-BAJ-RLB |
| ) | |
| JAMES LEBLANC, *et al*., ) | |
| ) | |
| Defendants. ) | |

**Opposition to Defendants' Motion for Partial Summary Judgment**

## I.  Introduction

Plaintiff Wilfred Guy is an inmate at the Louisiana State Penitentiary. He has a neurological impairment that affects his ability to hear, although he is not deaf. The parties agree that as a result of that impairment, Mr. Guy has been barred from any participation in sports, hobbycraft, and the rodeo. They agree that for periods of months on end, Mr. Guy's impairment prevented him from receiving any incentive pay at all. And while he was given a "pocket talker" device for in-person conversations, Mr. Guy has never been allowed to use Angola's teletypewriter (TTY) phone.

Defendants have moved for summary judgment. R. Doc. 19. Their motion, however, should be denied for the reasons detailed below.

## II.  Discussion

**A.    This Court should deny Defendants' Motion because Defendants' material facts are internally contradictory and disputed by Plaintiff.**

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact." *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).

Here, Defendants' motion should be denied because their material facts are not even internally consistent. Defendants' material fact Number 32 contends that "LSP requires offenders such as Plaintiff to request a job change." But that is contradicted by Number 36, which contends

1

that: "In May 2017, <u>LSP staff</u> requested Plaintiff for a janitorial position in the mattress factory due to staffing being below quota." (Emphasis added.)

It cannot simultaneously be true that inmates must make a request to obtain a job change, and also that job changes can result from by staff request. According to Defendants' testimony, job changes can happen in a number of different ways. They can result from: "inmates making requests, or sometimes security, or prison enterprises, which we have all the industries here, the mattress factory, tag plant, the broom and mop. They may request inmates for their areas." R. Doc. 19-4 at 162.[1]

Defendants' material facts Numbers 9 and 59 are also contradictory. Number 9 says that "The 'no hobbycraft' restriction, as written, prevents Plaintiff from participation in hobbycraft activities." But Number 59 says his "duty status does not prevent him from attending, selling hobby shop items, or visiting with family." Both cannot be true – his duty status cannot both bar from "participation in hobbycraft activities" and also not bar him from selling hobby shop items. The truth is that his no-hobbycraft duty status *does* bar him from selling hobbycraft items. *See* 22 L.A.C. § 313 (F)(7)(a) ("Funds may only be sent to the facility and processed for hobbycraft purchases properly supported by a hobbycraft agreement in accordance with established policy and procedures.")

Plaintiff also disputes material fact Number 41, which suggests that Dr. Lavespere testified that the question of whether an offender can participate in sports "boils down to what is safe for the institution, and what is safe for the offender." In his full testimony, Dr. Lavespere repeatedly

---

[1] If, however, LSP *does* require inmates to request job changes as reasonable accommodations, it would be a concession that LSP is violating the ADA. That is because the ADA holds that an explicit request is not necessary when the need for an accommodation is obvious. *See, e.g., Robertson v. Las Animas Cnty. Sheriffs Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007); *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891 (7th Cir. 1996); *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006).

referenced a factor apart from safety: institutional liability. *E.g.*, *id*. at 68 ("Every duty status that I do, I look at the safety of the offender, and **the safety and liability on the institution**.")[2]

Thus, because Defendants' material facts are neither internally consistent nor undisputed, their Motion should be denied.

**B.    Under Federal Law, Plaintiff's Claims are Subject to a Four-Year Statute of Limitations and Any Claims for Injunctive Relief Must be Analyzed Using the Repeated Violations Doctrine.**

In their motion, Defendants first argue that Plaintiff's claims have prescribed. R. Doc. 19-1 at 6.  But a determination of the applicable statute of limitations (prescription) period to this action required a detailed analysis of federal law and accrual doctrines and an application of those laws and doctrines to Plaintiff's claims. *First*, the statute of limitation period for Mr. Guy's claim is four years, not one year. *Second*, Plaintiff's claims must be analyzed under the Repeated Violations Doctrine, which holds that each day an individual is denied access to a program, service, or activity constitutes a separate and actionable claim for relief under the ADA/RA. Carefully applying the four year statute of limitation and the Repeated Violation Doctrine to Plaintiff's claims, the Court should hold that the majority of Mr. Guy's claims are not prescribed.

---

[2]See also:

- "I try to keep the offender safe, and I try to keep the **institution from having liability**." Ex R. Doc. 19-4 at 58.
- "[W]e try to be fair to the offender **keeping the liability off the penitentiary.**" *Id*. at 60.
- "So he is not happy about it, but he understands the health risk involved, and the **liability on the institution**." *Id*. at 63-64.
- "You know, **it's strictly keeping liability off this facility**, what is safe for the inmate, and what is best for the facility." *Id*. at 70.
- "Well, because of, again, the possibility of putting him at risk for harm, and putting the **liability on the institution**." *Id*. at 89.
- "[Y]ou have to be cautious this day and time because it's the **liability of the institution**, the safety of the institution, and the safety of the inmate." *Id*. at 90.

1.      *Mr. Guy's Claims are Subject to a Four-Year Statute of Limitations and Not a One-Year Statute of Limitations Period.*

In 1990, Congress enacted the Civil Justice Reform Act of 1990 ("CJRA"), Pub.L. No 101–650, 104 Stat. 5089 (codified in scattered sections of 28 U.S.C.). In Section 313 of that Act, Congress created a general, catch-all statute of limitations of four years for any "civil action arising under an Act of Congress enacted after" December 1, 1990. CJRA § 313, 104 Stat. at 5115 (codified as amended at 28 U.S.C. § 1658); *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004). In 2004, the Supreme Court considered whether a federal cause of action for a violation of a federal statute that existed before December 1, 1990—but was amended after December 1, 1990—gets the benefit of the four-year limitations period of § 1658. The Court unanimously held that "a cause of action arises " 'under an Act of Congress enacted' after December 1, 1990—and therefore is governed by § 1658 's 4–year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post–1990 enactment." *Jones*, 541 U.S. at 382, 124 S.Ct. 1836.

In this case, both relevant acts of Congress were originally enacted before December 1, 1990. The ADA was originally enacted on July 26, 1990. Americans with Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327. The Rehabilitation Act was originally enacted on September 26, 1973. Rehabilitation Act of 1973, Pub.L. No. 93–112, 87 Stat. 355. But Congress amended both of these acts after December 1, 1990. On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110–325, 122 Stat. 3553. This act revised the definition of "disability" for both the ADA and the Rehabilitation Act. *See id*. § 4, 122 Stat. at 3555; *id*. § 7, 122 Stat. at 3558 (redefining a person with a disability for Rehabilitation Act purposes in terms of the revised definition of disability for the amended ADA).

Therefore, under *Jones*, the first step to determine the statute of limitations that applies turns on whether Mr. Guy's ADA and Rehabilitation Act claims were "made possible" by the

ADAAA's revised definition of disability. *Jones*, 541 U.S. at 382, 124 S.Ct. 1836. Before the ADA was amended in 2008, it defined the disability of an individual, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." ADA § 3(2)(A), 104 Stat. at 329–30 (current version at 42 U.S.C. § 12102(1)(A)). The act itself contained no further definition of "physical or mental impairment," "substantially limits," or "major life activities." *See id.*

Before the ADAAA's enactment, the federal courts had interpreted these key terms of the definition of disability. In 1999, the Supreme Court held that "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *overturned by statute*, ADAAA § 4, 122 Stat. at 3556 (codified at 42 U.S.C. § 12102(4)(E)). The following year, in 2002, the Supreme Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), *abrogated in part by* ADAAA § 4, 122 Stat. at 3556 (codified at 42 U.S.C. § 12102I-(D)).

After passage of the ADAAA, however, these cases no longer reflect current law. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 573–74 (4th Cir.2015) (observing that "[i]n enacting the ADAAA, Congress abrogated earlier inconsistent caselaw"). In passing the ADAAA, Congress explicitly expressed, in its "purposes" section, its disagreement with the Supreme Court's interpretations of the ADA in *Toyota* and *Sutton*, and the applications of those cases by the lower federal courts. ADAAA § 2(b)(2)-(5), 122 Stat. at 3554. Congress enacted several "rules of construction" intended to overrule these cases:

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as....

*Id*. § 4, 122 Stat. at 3555–56 (codified at 42 U.S.C. § 12102(4)).

Defendants do not attempt to explain whether Mr. Guy's claims were made plausible under the ADA and Rehabilitation Act as they existed before the ADAAA or whether they were "made possible" by the ADAAA's revised definition of disability.

There can be little doubt, however, that Mr. Guy's claims under the ADA and Rehabilitation Act were "made possible" by the ADAAA's revised definition of disability. First, Mr. Guy has been provided a hearing aid or pocket talker at different times to aid his ability to communicate. Under *Sutton*, these would be considered "mitigating measures" that would have rendered Mr. Guy non-disabled. Further, Mr. Guy is hard of hearing, but with his pocket talker or hearing aid, there is zero evidence that he is wholly "prevented" or "severely restricted" from doing activities that are of central importance to most people's daily lives. Under *Toyota*, Mr. Guy would not have been "disabled enough" to qualify as a covered individual. Indeed, Mr. Guy is one of the covered individuals Congress aimed to protect with the ADA Amendment Act: Those individuals who have a limitation but are not wholly prevents from participating in *all* major life activities due to their disability. Because Mr. Guy's claims were "made possible" by the ADAAA's revised definition of disability, under *Jones* the statute of limitations period would be four (4) years, not

one (1). Therefore, Mr. Guy can sue for discrimination encountered or experienced between July 12, 2013 and the present.

While this may seem like it is the end of the analysis, it is only the first step. The Court must next analyze what constitutes a "prohibited act" and whether each encounter or experience with discriminatory conduct is a separate "prohibited act."

2.    *The Repeated Violation Doctrine is Applicable to Mr. Guy's Claims.*

Mr. Guy's claims are timely because they are subject to the Repeated Violation Doctrine.

In *United States v. Luminant Generation Co., L.L.C.*, the Fifth Circuit outlined the contours for determining when a violation of a statute accrues as a matter of law and whether subsequent ongoing conduct is actionable or time barred.[3] In *Luminant Generation Co.*, the Fifth Circuit was tasked with evaluating when a claim for alleged violation of § 7475(a) accrued as a matter of law.[4] The parties did not dispute that the applicable statute of limitations for this environmental statute was five years.[5] The Fifth Circuit explained the difference between the parties' positions as follows:

> The defendants contend that a facility modified without a preconstruction permit violates § 7475(a) as a one-time occurrence: the moment construction begins without a preconstruction permit. The five-year clock then begins to tick away, never to be restarted for a § 7475(a) claim related to that unpermitted construction period. The plaintiffs argue, on the other hand, that a facility modified without a permit continuously violates § 7475(a) anew each day it operates post-construction. Stated differently, a new five-year clock begins to run each day a modified facility *operates* without a permit. Under the plaintiffs' interpretation, the defendants could be held liable for civil penalties for each day their modified facilities operated without a permit on or after August 16, 2008; on the other hand, the defendants' interpretation means that all of the claims for civil fines, penalties, or forfeitures are time barred.[6]

---

[3] 905 F.3d 874, 881 (5th Cir. 2018).
[4] *Id.*
[5] *Id.*
[6] *Luminant Generation Co., L.L.C.*, 905 F.3d at 881 (emphasis original).

To resolve the parties' dispute, the Fifth Circuit stated, "We quite naturally begin with the text of § 7475(a)."[7] In evaluating the language of the statute, the court determined that the statute imposed "Preconstruction requirements" and did not "impose post-construction operational obligations."[8] Based on the Court's determination that the text of the statute only imposed "preconstruction requirements," and that the statute did not impose any ongoing operational obligations, the Fifth Circuit determined that "Section 7475(a) violations occur on the first day of construction."[9] While the outcome in *Luminant Generation Co.* is specific to Section 7475, the test articulated by the Court is universally applicable and illuminative. A district court must first look at the text of the statute to determine when the statute of limitations begins to run and whether ongoing conduct is actionable. Only after the Court has determined what is required or prohibited by the statute can the Court then determine whether the statute of limitations "begins to tick away, never to be restarted" or whether it "begins to run anew each day."

Just recently, in *Hamer v. City of Trinidad*, the Tenth Circuit had occasion to perform this precise analysis as it relates to a case brought under the ADA/RA.[10] In *Hamer*, the plaintiff encountered inaccessible sidewalks more than two years before the day he filed his lawsuit in a state with a two-year statute of limitations. The district court concluded that the plaintiff's claims were untimely because the plaintiff was undoubtably "aware of the nature and extent of the City's discrimination" more than two years prior to filing suit. *Id*. at 1098. The district court denied the plaintiff's argument that claims remained timely because the City "violate[d] both statutes each day" that it failed to remedy its non-compliant sidewalks and curb cuts. *Id*. at 1099.

On appeal, the Tenth Circuit Court of Appeals overturned the district court's ruling, holding that the plaintiff's claims were timely under the repeated violation doctrine. The Tenth

---

[7] *Id*. at 882
[8] *Id*.
[9] *Id*. at 884.
[10] 924 F.3d 1093 (10th Cir. 2019).

Circuit explained that "[o]ur starting point is the plain language of Title II and section 504." *Id*. at

1103. The Tenth Circuit explains it better than Plaintiff's counsel could:

> Title II mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, section 504 mandates in part that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).
>
> Obviously, neither of these statutes state outright when or how often a public entity violates them. They simply command that no qualified individual may "be excluded" from, "be denied" the benefits of, or "be subjected" to discrimination under a service, program, or activity. With that said, that language is phrased in the present tense (albeit in the passive voice), which suggests that a qualified individual who *currently* experiences discrimination under Title II or section 504 suffers an injury. And so the same language also suggests that a qualified individual suffers new discrimination and a new injury each day that she cannot utilize a non-compliant service, program, or activity—even if the barriers giving rise to her claim were ones she encountered before. After all, if sidewalks and curb cuts actually do constitute a service, program, or activity of a public entity—a question that we express no opinion on today—a qualified individual with a disability would still "be excluded" from utilizing any given sidewalk or curb cut each day that it remained noncompliant. Likewise, that same individual would still "be denied" the benefits of that sidewalk or curb cut when she encountered it a day ago just as much as when she first encountered it a year ago.

*Id*. at 1104 (emphasis original).

Based on this, the Tenth Circuit concluded that "a public entity *does* commit a 'new violation'

each day that it fails to remedy a non-compliant service, program, or activity." *Id*. at 1105

(emphasis original). The Court further held that the ADA imposes an affirmative obligation to

accommodate and that failure "to act in the face of an affirmative duty to do so axiomatically gives

rise to liability." *Id*. The Court also explained that the repeated violations doctrine transforms what

would otherwise represent a single, time-based claim into an ongoing series of fresh claims.[11] The

---

[11] *Id*. at 1101 ("As shown below, the repeated violations doctrine 'transforms what would otherwise represent a single, time-barred claim A into a series of fresh claims, identified as claims B, C, D, etc.' ")

Court further articulated, however, that a covered entity does not face unlimited liability for damages, explaining that the repeated violations doctrine "nonetheless limits the plaintiff's ability to recover damages to only those injuries incurred during the limitations period immediately preceding suit (the plaintiff, of course, can also recover damages for any injuries incurred after filing suit)." *Id.* at 1108.

In conducting its analysis, the Tenth Circuit also cleared up another loose end: the Fifth Circuit case of *Frame v. City of Arlington*. The Tenth Circuit analyzed this case and identified that it does not conflict with the repeated violations doctrine:

> we also note that the Fifth Circuit's decision in *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc), does not bear on Plaintiff's present appeal. The *Frame* court held that a single cause of action accrues under Title II and section 504 when the plaintiff "has sufficient information to know that he has been denied the benefits of a service, program, or activity of a public entity." *Id.* at 238. One may think that holding amounts to a rejection of the repeated violations doctrine. But the question whether the repeated violations doctrine applies to Title II claims was not before the court in *Frame*. Indeed, *Frame* only considered whether a Title II cause of action accrues when the plaintiff discovers he has been injured or when the public entity engaged in the wrongful act that caused the injury. *Id.* at 238–40. Nothing in its holding rejects or is inconsistent with the repeated violations doctrine. Thus, for our purposes today, *Frame* is of limited value.

*Id.* at 1103 n. 6.



Where does all of this leave this Court?

Here, Mr. Guy brings claims asserting that Defendants have illegal policies and procedures and that they have applied those policies and procedures to Mr. Guy. Utilizing *Hamer*, the proper outcome is thus: under the Repeated Violation Doctrine, Mr. Guy's claims for injunctive and declaratory relief are viable and are not barred by the statute of limitations. Further, to the extent Mr. Guy has suffered damages, his damages are limited to within the four (4) years prior to filing suit (and during the ARP tolling period and after filing suit). Using a four-year statute of limitation period, Mr. Guy can recover damages incurred between July 12, 2013 and the present.

Indeed, the inapplicability of the statute of limitations to Mr. Guy's claims is best evidenced by Mr. Guy's written request for accommodation/modification. On March 8, 2017 Mr. Guy made a written request for accommodation/modification specifically for access to "sports, hobbycraft, and rodeo, three programs that my hearing disability does not prevent me from being able to participate in." Ex. K (ARP) at 4. In his written request Mr. Guy identified his disability and his needed accommodation. On July 14, 2017 the DOC denied Mr. Guy's request. *Id*. at 5.

The State of Louisiana made an intentional choice to deny Mr. Guy a reasonable accommodation. The State of Louisiana's employees had more than four months to review, consider, and draft a response to Mr. Guy's request for accommodation. Defendants' ADA coordinator admitted that he did not even speak to Dr. Lavespere prior to denying Mr. Guy's request for reasonable accommodation.[12] The State of Louisiana made no attempt to determine the risks of hobbycraft or sports, accommodations or auxiliary aids that would help alleviate these unidentified risks, or otherwise ensure that Mr. Guy was not being subjected to discrimination. In fact, the decision to exclude Mr. Guy was made, in part, as a result of a self-serving interest of

---

[12] R. Doc. 19-4 at 72.

avoiding personal or institutional liability. As is set forth by the Fifth Circuit, this self-serving interest sounds in animus-based discrimination. *Shaikh*, 739 F. App'x at 223 at n. 9.

Indeed, Mr. Guy's claim for relief related to the "No Sports, No Hobbycraft, No Rodeo" restriction from pre-March 8, 2017 is markedly different from his claim *after* he submitted the March 8, 2017 written request for modification. The Jury may conclude that, prior to March 8, 2017, the State of Louisiana did not have "notice" of Mr. Guy's need for an accommodation. In contrast, once Mr. Guy submitted his March 8, 2017 request for accommodation and the State denied this request without an individualized inquiry, all doubt regarding the State's discriminatory intent was erased. The State of Louisiana's denial of Mr. Guy's request for disability accommodation constituted a discrete act of discrimination, triggering the statute of limitations anew. Thus, a new "discrete act of discrimination" was committed on July 14, 2017. For these reasons, Mr. Guy's claims are timely.

**C.      Plaintiff's "No Sports, No Hobbycraft, No Rodeo" Claims are Timely Because Defendants Committed Discrimination Between July 12, 2013 and Present, Including Denying a Written Request for Modification on July 14, 2017.**

Mr. Guy has been under a "duty status" that includes "No Sports, No Hobbycraft, No Rodeo" since September of 2012. Just as with the plaintiff in *Hamer*, the State of Louisiana committed a "new violation" each day that it failed to remedy its non-complaint policy that discriminates against disabled persons such as Mr. Guy. Mr. Guy encountered this discriminatory policy each time he wanted to participate in sports between July 12, 2013 and the present because Mr. Guy has been under the restriction the entire time. The State had an affirmative obligation to accommodate Mr. Guy. The State of Louisiana took no steps to affirmatively accommodate Mr. Guy and, instead, has let him languish. By failing to act in the face of an affirmative obligation to accommodate, the State of Louisiana has "axiomatically give[n] rise to liability." *Hamer* at 1105.

Notably, however, Mr. Guy's recovery of damages is limited to the time period of July 12, 2013 and the present. Mr. Guy cannot recover damages between September 2012 and the July 12,

2013 because those damages are beyond the four-year statute of limitations. Nor are any damages incurred by Mr. Guy between September 2012 and the July 12, 2013 saved by the Repeated Violations Doctrine, for the reasons discussed above.

**D.    Plaintiff's Claims for Damages Unrelated to Mental or Emotional Injury Are Not Barred by the PLRA.**

Plaintiff validly seeks compensatory damages under the ADA/RA for lost wages and underpayment of wages. Plaintiff also seeks an award of nominal damages. Defendants raise the issue of whether Mr. Guy can recover these types of damages. R. Doc. 19-1 at 16-18. The Prison Litigation Reform Act states that "No federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (emphasis added).

Numerous courts of appeals have held that the 1997e(e) bar does not apply to claims for damages unrelated to "mental or emotional injury," such as other compensatory damages, nominal damages, and punitive damages. *See Munn v. Toney*, 433 F.3d 1087,1089 (8th Cir. 2006); Hubbard v. Taylor, 399 F.3d 150,167 (3rd Cir.2005); *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003); Searles v. Van Bebber, 251 F.3d 869, 879-81 (10th Cir.2001) (nominal and punitive damages for First Amendment violation not barred); *Allah v. Al-Hafeez*, 226 F.3d 247,252 (3rd Cir. 2000) (same); *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir.1998) (any form of relief for First Amendment violations available, if not for mental or emotional injury); *Thompson v. Carter*, 284 F.3d 411, 418 (2nd Cir. 2002) (nominal and punitive damages available for deprivation-of-property claim).

Here, Mr. Guy's counsel readily recognizes that Mr. Guy, a current prisoner, is not entitled to mental or emotional injury suffered while in custody because he has not suffered a "physical injury." However, nothing in 42 U.S.C. § 1997e(e) prohibits Mr. Guy for suing for lost wages, underpayment of wages, and nominal damages. These are the precise types of damages Mr. Guy

will seek to recover at the trial of this matter. Additionally, in the Complaint Mr. Guy alleges "it is Wilfred's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against the State of Louisiana, regardless of the amount, would deter the State from discriminating against disabled individuals in the future."[13]

**E.    Under Louisiana law and a consent decree with the U.S. Department of Justice, the DOC must provide TTY access to "all" hearing-impaired inmates. But the DOC admits it only provides access to those with "profound hearing loss" – a screening criteria that violates the Administrative Code, the DOJ consent decree, and the ADA.**

Under the ADA, it is illegal for a prison to "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities" from any service. 28 C.F.R. § 35.130(b)(8). Similarly, prisons are forbidden from providing "different or separate aids, benefits, or services" to "any class of individuals with disabilities than is provided to others" unless necessary to provide equally effective services. 28 C.F.R. §35.130(b)(1).

Here, Wilfred Guy requested as an accommodation access to the teletypewriter ("TTY") phone at Angola. His access to the TTY phone should have been automatic: pursuant to a consent decree with the U.S. Department of Justice, the DOC was required to "promptly provide TTY units to **all** deaf and hard of hearing inmates residing in residential units." Ex. A at Section VIII(2) (emphasis added). That requirement was written into Louisiana law, which states that "Each unit shall provide a TDD/TTY to **all** deaf or hearing-impaired offenders residing in housing areas to the extent that pay telephones are available to other offenders." 22 L.A.C. § 312 (H)(1)(b) (emphasis added). And it is undisputed that Mr. Guy is hearing-impaired. R. Doc. 21-11 at RFA No. 4 (admitting that "Wilfred Guy has been identified as 'hearing impaired' since at least 2012").

But in deposition, the DOC conceded that they do not provide TTY access to all hearing-impaired inmates, instead limiting it to only those inmates with "profound" hearing loss":

---

[13] *See* R. Doc. 1, ¶ 7.

```
3    Q.    What was the reason ultimately that Mr. Wilfred
4    Guy was not permitted to use the TTY machine?
5    A.    His hearing impairment was not such that he met
6    criteria to use the TTY.
7    Q.    And what is the criteria to use the TTY?
8    A.    It's going to be hearing loss, profound hearing
9    loss that keeps him from utilizing a telephone with an
10   amplified headset, handset.  The receiver amplified.
```

R. Doc. 19-4 at 44.

This violates the Consent Decree and Administrative Code's clear directive that TTY access is mandatory for "**all** deaf or hearing-impaired offenders."[14] And it also does exactly what the ADA forbids: creates an "eligibility criteria" of profound hearing loss that tends to "screen out an individual with a disability or any class of individuals with disabilities" from any service. 28 C.F.R. § 35.130(b)(8).

With regard to Mr. Guy in particular, an audiologist determined that "amplified telephone will be sufficient [for Mr. Guy] as long as there is little to no ambient noise present during telephone calls." R. Doc. 19-2 at Material Fact No. 22. But Defendants point to <u>no evidence whatsoever</u> that Angola's regular telephone system is an environment with "little to no ambient noise."[15] (And as anyone who has had a telephone call with an Angola inmate knows, there is quite a lot of ambient noise in the background.)

---

[14] In their motion for partial summary judgment, Defendants attempt to disparage Plaintiff by saying that "Plaintiff's contention in this litigation is that he should have been provided access to the TTY telephone simply because he has a hearing impairment." R. Doc. 19-1. That is, of course, a basic recitation of the law. 22 L.A.C. § 312 (H)(1)(b) (TTY access is mandatory for "all deaf or hearing-impaired offenders.")  But it helps explain the DOC's repeated ADA violations – the DOC is so unfamiliar with its obligations towards inmates with disabilities that it thinks a *basic statement of the governing law* is something ridiculous to disparage.

[15] Once a plaintiff has established a prima facie case of a request for reasonable accommodation, the burden shifts to Defendants to show why the accommodation should not be provided. 28 C.F.R.

Thus, Defendants have violated the requirements of the Consent Decree and the Louisiana Administrative Code. And their "profound hearing loss" eligibility requirement violates the ADA. Accordingly, their Motion should be denied.

**F.      Defendants' motion should be denied because they agree that Mr. Guy went long periods without any pay because of his disability.**

Louisiana law requires that the DOC "shall provide employment opportunities and vocational training for all inmates, regardless of gender, consistent with available resources, physical custody, and appropriate classification criteria." R.S. 15:832(A). At Angola, inmates are paid for the work. R. Doc. 19-4 at 130. And

But Mr. Guy received no pay whatsoever for several months-long periods, even though the parties agree that even "with his hearing impairment, Mr. Guy is capable of doing some of the paid jobs at Angola." R. Doc. 21-11 at RFA Nos. 10-13.

The parties also agree as to the reason why Mr. Guy received no incentive pay for these periods. Due to the "classification decisions of the Department," Mr. Guy was assigned to "working cellblocks" which "automatically resulted in a field line job assignment." R. Doc. 19-1 at 12. But Mr. Guy had an "out of field" duty status due to his hearing impairment. R. Doc. 19-2 at No. 7Therefore, Mr. Guy was "unable to work" the field line job assignment because of the duty status. R. Doc. 19-1 at 12. Since he didn't work his assignment, he would not be paid. As Plaintiff described it, each day he would "go out by the gate and show my duty status, and then they [would] turn me around." R. Doc. 21-16 at 62:5 to 62:6. He would go back to the dorm, and was required to do janitorial work without pay. *Id.* at Page 62:8 to 62:22.

The question is whether this violates the ADA. Defendants argue that because "the classification of inmates is a matter left to the broad general discretion of prison officials," there

§ 35.150 ("public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens.")

is no ADA violation even through Plaintiff was "classified into housing dormitories where he could not receive incentive pay" due to his hearing-impaired duty status. R. Doc. 19-1 at 13.

But this is a prototypical example of disability discrimination. *See, e.g., Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (illegal to deny a person the benefits of a government activity by reason of their disability). The parties agree that Mr. Guy was put in a working cellblock side-by-side with non-disabled inmates. Each day, the non-disabled inmates would go out and work, and be paid for it. But Mr. Guy could *not* work and be paid for it, solely because he had a duty status for his hearing impairment.[16]

In fact, the DOC's 30(b)(6) representative testified that the only reason they could think of that an inmate would "go months without pay" was because of "a duty status, like if they have out of field, like I said before, no prolonged walking, squatting, standing, whatever the restrictions may be, until that is lifted, they can't go to work if that specific job they are assigned to requires those things." R. Doc. 19-4 at 144-145.[17]

Thus, the DOC's only defense – that "the classification of inmates is a matter left to the broad general discretion of prison officials" – is a total *non-sequitur*. It is certainly true that prisons have broad discretion to assign jobs to inmates; but it is also true that the ADA and RA bar the exercise of that discretion in a way that discriminates on the basis of disability. And letting non-disabled inmates in a cellblock work for money while making disabled inmates languish without pay is the precise conduct prohibited by the ADA. Defendants' motion should be denied.

---

[16] Defendants concede that even "with his hearing impairment, Mr. Guy is capable of doing some of the paid jobs at Angola," such as working as a dorm orderly, tier walker, or office clerk. R. Doc. 21-11 at RFA Nos. 10-13.

[17] One point of disagreement is that the DOC argues in their brief that "it was Plaintiff's obligation to request a job change." R. Doc. 19-1 at 12. But they also agree that would have been a futile gesture. The DOC's representative testified that "because of where he is housed . . . he does not have the opportunity to request a new job." R. Doc. 19-4 at 149; *see also id.* at 170-171 (if he had filled out a job change form "he would be given it back because of the fact of where he's housed, his job comes along with that housing.")

**G.    Defendants' motion should be denied because they concede that disabled inmates are barred from participation in all sports without an adjustment by a doctor, and the Angola doctor testified that "I won't make an adjustment for sports."**

Defendants point out in their brief that a "public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." R. Doc. 19-1 at 13, citing 28 C.F.R. §35.130.

Here, the DOC is doing precisely that – banning all disabled inmates from participating in contact sports, based on speculation, stereotypes, and generalizations.

First, LSP's policy is that no inmate "assigned restrictive duty" will be "allowed to participate in sports and/or recreational activities, unless specified by the treating health care provider." R. Doc. 19-13 (LSP Directive No. 13.063) at 3. That caveat – "unless specified by the treating health care provider" – *sounds* like an opportunity for an inmate to receive an individualized assessment of their ability to play sports. But it is not. That is because Dr. Lavespere, head of medical at LSP, testified categorically: "**I won't make an adjustment for sports**." R. Doc. 19-4 at 69.

And it is clear that Dr. Lavespere's decision about disabled inmates being banned from sports is based on speculation. For example, he was quick to testify that Mr. Guy, with his hearing impairment, would be at an "increased risk" of playing "pickle ball." R. Doc. 19-4 at 71. But in the same deposition, Dr. Lavespere confessed that *he does not know what the sport of pickle ball is. Id*. at 90. (Pickleball is a "paddle sport created for all ages and skill level"[18] that involves a perforated plastic ball "similar to a wiffle ball, but slightly smaller." The game "was designed to be easy to learn and play whether you're five, eighty-five or somewhere in between."[19])

---

[18] https://www.usapa.org/what-is-pickleball/ (last accessed 2019/6/17).
[19] https://www.pickleball.com/what-is-pickle-ball-s/118.htm  (last accessed 2019/6/17).

Thus, the DPS&C is banning Mr. Guy and other inmates with disabilities from sports they cannot even identify or describe with no opportunity for an "adjustment," even when those sports are low-intensity whiffle-ball-like games designed for children and the elderly.

Indeed, the Angola ADA coordinator conceded that he denied Mr. Guy's request to participate in sports using a packet of information, despite the fact that nothing in the packet "explains how sports, hobby craft or rodeo would be dangerous for Mr. Wilfred Guy." R. Doc. 19-4 at 42. And it was admitted at deposition that the Angola ADA coordinator and Dr. Lavespere have never met to discuss the ADA or Rehabilitation Act. *Id*. at 72. Nor can Dr. Lavespere explain how much additional risk Mr. Guy is at by playing sports such as baseball, basketball, or pickleball. *Id*. at 69-71. In fact, when pressed as to the specific percentage risk for Mr. Guy, Dr. Lavespere admitted that he couldn't state a percentage because doing so would be "just pure speculation." *Id*. at 70.

This practice violates the ADA/RA's requirement of individualized assessments of an activity's risks and a person's needs, including in the sports context. *See Anderson v. Little League Baseball, Inc*., 794 F. Supp. 342, 345 (D. Az. 1992) ("Defendants' policy amounts to an absolute ban on coaches in wheelchairs in the coachers box, regardless of the coach's disability or the field or game conditions involved. Regrettably, such a policy — implemented without public discourse — falls markedly short of the requirements enunciated in the Americans with Disabilities Act and its implementing regulations."); *Shultz v. Hemet Youth Pony League*, 943 F. Supp. 1222, 1225-1226 (C.D. Cal. 1996) (failure of a baseball league to "make necessary and reasonable attempts to ascertain what modifications, if any, were plausible in order to accommodate Plaintiff's disability" violated ADA). Accordingly, Defendants' motion should be denied.

**F.    Defendants' motion should be denied because they concede that Plaintiff has been actually excluded from participation in hobbycraft due to his disability, which violates the ADA.**

Defendants' agree that Plaintiff has had a "no hobby craft" duty status for at least the last seven years, and that the no hobbycraft restriction, "as written, prevents Plaintiff from participation in hobbycraft activities." R. Doc. 19-2 at Material Facts No. 6, 9, 12. They do not dispute that Plaintiff made an explicit, written request for accommodation for access to hobbycraft. R. Doc. 19-7 at 4. Nor do Defendants dispute that they denied Plaintiff's request. *Id.* at 5.

Their defense, however, is that despite being *actually* prevented from participation in hobbycraft, Plaintiff is somehow not *hypothetically* prevented because "Dr. Lavespere testified that he would potentially allow Plaintiff to engage in certain hobbycraft activities such as leather-working, jewelry making, and painting upon request to him." R. Doc. 19-1 at 15.

What defense is this? The Americans With Disabilities Act has no "we denied your request for accommodation, but if you ask again and this time go outside the accommodation process, we might potentially give you a different answer" defense to a claim. *Cf.* 42 USC § 12113 (listing defenses to an ADA claim).

Nor would such a concept be consistent with the law. *First*, Louisiana law is explicit that "The ADA does not require that a request for accommodation be provided in any particular manner; therefore, the department is charged with having knowledge, or deemed with having knowledge, of the request regardless of the form of the request." 22 L.A.C. § 308(E)(1)(c). And the law explicitly puts the burden on the prison's ADA coordinator to reach out to medical director if their input is needed. 22 L.A.C. § 308(E)(2)(a) ("the unit ADA coordinator shall seek to determine . . .if additional medical information is needed. At this point of the process, the unit ADA coordinator may request that the unit medical director" provide information.).

*Second*, even if Dr. Lavespere were willing to "potentially allow" Plaintiff to participate in hobbycraft in the future, that would be no defense to Plaintiff's claim about current and past

exclusion. Under the ADA, the <u>exclusion itself</u> violates the law. 42 USC § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation" in programs.) And Defendants concede that Mr. Guy's current no-hobbycraft duty status, "as written, prevents Plaintiff from participation in hobbycraft activities." R. Doc. 19-2 at Material Facts No. 6, 9, 12. At best, an appeal to Dr. Lavespere might only remedy future exclusion; it cannot change the present or past.

*Third*, it is not clear that Dr. Lavespere would actually overrule the ADA coordinator's denial of hobbycraft to Mr. Guy. That is because he also testified that: "[T]he ADA coordinator is in charge of making those final decisions" (R. Doc. 19-4 at 73) and "Whenever he makes those ADA recommendations, I sign off on them" (*id*. at 82).

As a result, the facts remain:

(1) Mr. Guy made a request for accommodation to do hobbycraft activities;[20]

(2) His request was denied.[21]

(4) He is therefore prevented from participation in hobbycraft activities;[22]

(4) Yet everyone agrees he can safely do certain hobby craft activities.[23]

No more is needed to prove Mr. Guy's ADA claim. Defendants' motion should be denied.

**G.    Defendants' "No Rodeo" duty status practice violates the ADA, but is moot here because Plaintiff is not asking for rodeo access.**

Defendant's "no rodeo" duty status system violates the ADA. At Angola, the general practice is to add a "no rodeo" restriction to *any* inmate with a medical duty status.[24]    And Dr.

---

[20] R. Doc. 19-7 at 4 (ARP).

[21] R. Doc. 19-7 at 5 (ARP denial).

[22] R. Doc. 19-2 at Material Fact No. 9 ("The "no hobbycraft" restriction, as written, prevents Plaintiff from participation in hobbycraft activities.")

[23] R. Doc. 19-4 at 69 ("Now, leather work, painting, there's no inherent danger to him. He can do that all day.")

[24] R. Doc. 19-4 at 51 (30(b)(6) witness could not identify a single inmate "having a duty status but nonetheless having the ability to participate in sports, hobby craft, or rodeo"); *Reeves v. LeBlanc*, 13-cv-586 (M.D. La., Oct. 23, 2014) (inmate with flat feet had "no sports, no hobby

Lavespere testified "I won't make an adjustment for rodeo." R. Doc. 19-4 at 69. This violates the requirement of a "individualized assessment mandated by the ADA." *Kapche v. City of San Antonio*, 304 F.3d 493, 499 (5th Cir. 2002). But as Defendants point out, Plaintiff does not currently wish to participate in the rodeo. As a result, the point is moot.

**H.  Injunctive relief is needed to remedy Defendants' facially illegal policies, and to allow Plaintiff to participate in hobbycraft, sports, and TTY access.**

Injunctive relief is appropriate when defendants have a facially illegal policy. *See, e.g., Oxford House, Inc. v. City of Baton Rouge*, 932 F.Supp.2d 683, 703 (M.D. La., 2013). Here, injunctive relief is needed because Plaintiff has identified three of Defendants' policies that are facially illegal:

- LSP's Directive 9.036's that bars all hobbyshop for inmates "under medical care and/or treatment, requiring a duty status";[25]

- LSP's Directive 19.001's that caps the pay for inmates with Limited Duty statuses to four cents per hour, while non-disabled inmates can make a dollar or more per hour;[26]

- LSP's criteria limiting use of the TTY phone to those with "profound hearing loss".[27]

Plaintiff agrees with Defendants that no injunction is needed with regard to his job duties or his rodeo access. But Plaintiff continues to be barred from participating in hobbycraft,[28] even though the State of Louisiana concedes he can safely participate in hobbycraft activities.[29] An injunction is thus needed to remedy Defendants' failure to provide Mr. Guy with access to

---

craft, [and] no rodeo" added to duty status); Plaintiff's Undisputed Fact No. 10 (inmate with genital warts had "no sports, no hobby craft, [and] no rodeo" added to duty status).
[25] See discussion at R. Doc. 21-1 at 9-12.
[26] See discussion at R. Doc. 21-1 at 12-13.
[27] *Cf.* 22 L.A.C. § 312 (H)(1)(b) ("Each unit shall provide a TDD/TTY to **all** deaf or hearing-impaired offenders residing in housing areas to the extent that pay telephones are available to other offenders.") (emphasis added).
[28] Defendants' Statement of Material Facts at No. 9 ("The 'no hobbycraft' restriction, as written, prevents Plaintiff from participation in hobbycraft activities.")
[29] R. Doc. 19-4 at 69 ("Now, leather work, painting, there's no inherent danger to him. He can do that all day.")

hobbycraft. With regard to sports, the Court can evaluate Mr. Guy in person at the time of trial to determine whether he has completed physical therapy and can participate in sports or is reasonably anticipated to be able to participate in sports in the near future.[30]

With regard to the TTY phone, Dr. Sherry Mouton determined that an "amplified telephone will be sufficient [for Mr. Guy] as long as there is little to no ambient noise present during telephone calls." R. Doc. 19-2 at Material Fact No. 22. But since Defendants have presented no evidence nor made any argument whatsoever that Angola's regular phones are in an environment with "little to no ambient noise." Accordingly, they should be required to comply with the Louisiana Administrative Code and provide Mr. Guy with TTY access.[31]

Accordingly, Defendants' motion should be denied.

### III.    CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment should be denied.

Respectfully submitted,

/s/ Garret S. DeReus
BIZER & DEREUS, LLC
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Marc Florman    (LA # 35128)
jhammack@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

/s/ William Most
LAW OFFICE OF WILLIAM MOST, L.L.C.
Louisiana Bar No. 36914
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (650) 465-5023
Email: williammost@gmail.com

---

[30] R. Doc. 19-3 at 84-85 (As of May 2019, Mr. Guy had two more physical therapy sessions remaining, and testified that he wanted to "go back to playing sports" once he gets better from physical therapy).
[31] "Each unit shall provide a TDD/TTY to **all** deaf or hearing-impaired offenders residing in housing areas to the extent that pay telephones are available to other offenders." 22 L.A.C. § 312 (H)(1)(b) (emphasis added).

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2019, a copy of the Plaintiffs' *Opposition to Defendants'*

*Motion for Summary Judgment* was transmitted to counsel for defendants, James "Gary" Evans,

by operation of ECF.


　_/s/William Most_
　William Most